UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————

In re:                                                           Case No. 20-30663
                                                                 Ch. 11
      The Roman Catholic Diocese of
      Syracuse, New York
                    Debtor.
———————————————————————

The Roman Catholic Diocese of Syracuse,
New York,                                                        Adv. Proc. No. 21-50005
                    Plaintiff,

          v.

LG 35 Doe; LG 42 Doe; LG 43 Doe;
LG 44 Doe; LG 79 Doe; LG 86 Doe,

                    Defendants.
———————————————————————

Appearances:

*Plaintiff's Counsel:*                                           *Defendants' Counsel:*

Stephen Donato, Charles Sullivan, Grayson Walter          Amy Keller, Richard Weisbeck
Bond, Schoeneck & King PLLC                                Lipsitz Green Scime Cambria LLP
One Lincoln Center                                         42 Delaware Avenue, Suite 120
Syracuse, New York 13202                                   Buffalo, New York 14202

**Decision and Order Granting Preliminary Injunctive Relief**

**Introduction**

     The Roman Catholic Diocese of Syracuse, New York ("Debtor" or "Diocese") filed for

bankruptcy protection on June 19, 2020. The pending chapter 11 case before the court is not a

typical bankruptcy. It results from a monstrous pattern of alleged sexual abuse and coverup

committed over the course of the past half-century. Those targeted were children—society's

youngest and most vulnerable—who bear lasting effects from abuse inflicted upon them at a young age. These child-victims comprise the large class of unsecured creditors in this case.

Debtor, nevertheless, is a venerable, nonprofit, religious institution established under both civil and canon law. Through a network of affiliated entities, it serves a devoted faithful who monetarily and spiritually support a shared religious mission that includes conducting regular religious observances, promoting religious education and performing vital social services for Debtor's members and the wider community.

This case requires a calibrated balancing of all constituent interests. As Debtor continues its efforts to forge a plan of reorganization that is fair and equitable to all creditors, parity within each creditor class must be maintained and estate assets must be preserved. Against this backdrop, the court considers Debtor's current motion to preliminarily enjoin six child sexual abuse victims from prosecuting state court litigation against various non-debtor third parties. (Adv. Doc. 5) ("Motion"). For the following reasons, the court grants injunctive relief.[1]

---

[1] Documents in the main case shall be referenced as "Bankr. Doc. __" and those in this adversary proceeding as "Adv. Doc. __." The record consists of the complaint (Adv. Doc. 1); motion for preliminary injunction enjoining certain lawsuits (Adv. Doc. 5) ("Motion"); declaration of James R. Murray sworn to on January 29, 2021 (Adv. Doc. 6) ("Murray Decl."); declaration of Stephen Breen sworn to on February 16, 2021 ("Breen Decl. Adv.") and accompanying exhibits ("Ex.") numbered 1-39 (Adv. Doc. 22); supplemental memorandum in support of Motion (Adv. Doc. 23); declaration of Stephen Breen regarding Debtor's assets and operations sworn to on June 19, 2020 (Bankr. Doc. 6) ("Breen Decl. Bankr."); declaration of Monsignor Timothy S. Elmer regarding Debtor's structure and pre-filing history sworn to on June 17, 2021 (Bankr. Doc. 7) ("Elmer Decl."); declaration of Amy C. Keller sworn to on January 14, 2021 in opposition to Debtor's motion for entry of stipulation and order staying continued prosecution of lawsuits (Bankr. Doc. 304); defendants' memorandum of law in opposition to Motion (Adv. Doc. 21); defendants' supplemental memorandum of law in opposition (Adv. Doc. 28); and transcripts of hearings held on February 11, 2021 ("Feb. 11 Tr."), February 18, 2021 ("Feb. 18 Tr.") and February 25, 2021 ("Feb. 25 Tr."). The court takes judicial notice of other filings in the bankruptcy case and its related adversary proceedings as referenced throughout. Title 11 of the United States Code shall be referred to as the "Bankruptcy Code" or "Code."

**Background of Debtor's Chapter 11 Case**

Debtor filed for bankruptcy protection in response to an avalanche of civil lawsuits under New York's Child Victims Act.[2] ("CVA"). Many of the sexual abuse lawsuits filed against Debtor also named its religious affiliates.

Debtor is a hierarchical institution that takes guidance and direction from Rome, including the appointment of its bishop by the Pope. (Elmer Decl. n.1, ¶ 8). Debtor's operations are, in turn, inextricably linked and interwoven with those of numerous affiliated religious entities it oversees.

Debtor's territory encompasses seven counties in Central New York.[3] One hundred nineteen Roman Catholic parishes, along with multiple Catholic schools, charities, cemeteries and other affiliated entities, operate within its borders. (*Id.* ¶¶ 8, 10, 21) ("Affiliated Entities"). Although they are technically and legally distinct from Debtor's entity, the Affiliated Entities share numerous integral characteristics with the Debtor, including, among other things, directors, insurance and a joint religious mission. (*Id.* ¶¶ 22, 30, 34, 37, 39, 45, 47, 49, 51, 53).

*The Joint Insurance Program*

Among the first-day orders entered upon Debtor's filing was authorization for the continued maintenance of Debtor's joint insurance program with its Affiliated Entities. (Bankr. Doc. 28).  Upon further notice and hearing, the final order, entered without objection, authorized

---

[2] In 2019, New York enacted the CVA, which triggered a statutory look-back period that permitted survivors of child sexual abuse to file civil lawsuits for damages that otherwise would have been precluded by applicable statutes of limitation. 2019 N.Y. Sess. Laws c. 11, §3. ("Act"). The Act allowed those victims until August 14, 2020, to file such lawsuits. Subsequently, the deadline for filing a lawsuit was extended to August 14, 2021 due to the COVID-19 pandemic.
[3] These include the counties of Broome, Chenango, Cortland, Madison, Oneida, Onondaga and Oswego. (Elmer Decl. ¶ 10).

Debtor to pay defense costs[4] and administrative costs related to the joint insurance program. (Bankr. Doc. 114 at 2).

The joint insurance program underscores Debtor's interwoven relationship with its Affiliated Entities. To distribute risk across a broad pool of beneficiaries, Debtor maintains a joint liability insurance program dating back to at least September 15, 1967. (Murray Decl. Ex. A). Debtor contends the insurance program covers sexual misconduct. On behalf of itself and its jointly insured parishes, Debtor commenced a separate pending adversary proceeding against 59 insurers that seeks declaratory relief as to the extent of coverage. (*See* Adv. Proc. 21-50002 Doc. 1) ("Insurance Litigation"). Until 1986, the joint insurance program purchased occurrence-based policies. Under these policies, liability by either Debtor or an Affiliated Entity counted toward an occurrence-based cap on coverage. (Murray Decl. ¶¶ 9, 18).

Debtor serves as a fiduciary for the Affiliated Entities and employs two claims professionals to service policies which cover both Debtor and 282 of its affiliates. (Debtor's motion for order authorizing maintenance of Diocese's insurance program) (Bankr. Doc. 13 ¶¶ 12, 23) (the "Insurance Motion"). Annually, each Affiliated Entity contributes to the insurance reserves by paying a premium to the Debtor on a pro rata basis. For fiscal year 2021, the fund totaled approximately $25.7 million. (*Id.* ¶ 14). This fund pays for defense costs and deductibles on insurance claims asserted by both Debtor and its Affiliated Entities. (*Id.* ¶ 14).

Debtor "is responsible for paying all claims" attributable to the Affiliated Entities' losses. (*Id.* ¶ 15). If there are surplus funds remaining at the end of a given fiscal year, Debtor rolls the surplus into a segregated reserve account that may be drawn upon at Debtor's fiduciary discretion to cover claims received. (*Id.* ¶ 22).

---

[4] Defense costs may be paid up to the amount of any applicable deductible or self-insured retention. (Bankr. Doc. 114 at 2).

*Debtor's April 15, 2021 Claims Bar Deadline*

On September 21, 2020, Debtor filed a motion seeking to set a deadline of March 1, 2021 for the filing of claims. (Bankr. Doc. 118). The Official Committee of Unsecured Creditors ("Committee") opposed the motion, instead seeking a deadline of August 14, 2021, coterminous with the CVA's deadline for commencing a lawsuit.[5] (Bankr. Doc. 150). By subsequent order, this court set a bar date of April 15, 2021 for filing proofs of claim. (Bankr. Doc. 214).

Bankruptcy courts maintain broad discretion to set claims bar dates irrespective of state statutes of limitations. Fed. R. Bankr. P. 3003(c)(3). Identifying the entire pool of liabilities to be addressed in a plan of reorganization is an essential first step in the chapter 11 process. By setting an earlier April 15, 2021 bar date, the court sought to minimize priority administrative costs. These costs are paid first and can easily mount when a bankruptcy case drags on, all to the detriment of lower priority creditor classes such as the unsecured class of child victims in this case. 11 U.S.C. § 507.

The court coupled the earlier April 15 bar date with a robust notice protocol intended to address due process concerns and allow creditors to timely file their claims. As a result, Debtor's case is now moving on an expedited track.

*Debtor's Adversary Proceeding Against Its Insurance Companies*

The Debtor's Insurance Litigation seeks to confirm coverage of sexual abuse claims under the insurers' policies. On February 4, 2021, Debtor moved for entry of an order referring the

---

[5] Currently, four of the eight Roman Catholic Dioceses in New York have filed for chapter 11 protection. The court notes that in two of those cases—the Buffalo Diocesan filing, which preceded the filing in this case, and the Rockville Centre Diocese, which filed four months later—the courts set August 14, 2021 as the claims bar date.

Insurance Litigation to mediation. (Adv. Proc. 21-50002 Doc. 3). A mediated settlement of the Insurance Litigation would advance the other essential piece in developing a plan of reorganization—i.e., identifying the sources and amounts of funding available to satisfy claims.[6]

*Stipulated Agreement with the Committee*

Given Debtor's interwoven relationship with its Affiliated Entities, the Committee unanimously and voluntarily stipulated to stay state court actions against Debtor and a number of co-defendant Affiliated Entities. (Bankr. Doc. 239 Ex. A) ("Parish Stay Agreement"). Many of the Affiliated Entities alleged Debtor was obligated to indemnify them for losses incurred, including attorney's fees and other defense costs. Likewise, many plaintiffs in those actions alleged Debtor was also obligated on liabilities attributable to the co-defendants and that plaintiffs would require discovery from the Debtor. The Affiliated Entities also claimed rights under Debtor's insurance policies.

In exchange for third-party stays of actions naming both Debtor and the Affiliated Entities, Debtor agreed to the Parish Stay Agreement's broad set of discovery demands under Fed. R. Bankr. P. 2004 and a timetable for document production. After notice and a hearing, Debtor sought the court's approval of the Parish Stay Agreement. Approximately 96% of the impacted unsecured creditor class had no objection and the Parish Stay Agreement was approved. (Bankr. Doc. 345). The court is overseeing ongoing document production according to the agreed-upon timetable.

---

[6] Debtor maintains that its insurance policies will be a major source of funding for any potential plan of reorganization. A mediated settlement between Debtor and its insurers will enable efficient pooling of the insurers' combined funds. This would benefit all creditors, including creditor-victims. All claims would share in this pooled distribution, regardless of whether coverage may have been denied on a claim if it were litigated, or if no policy would have covered the specific occurrence of abuse. Insurance policies will not be the sole source of the reorganization "pot," as Debtor has access to considerable discretionary funds, including the self-insurance funded reserve, and has represented that any Affiliated Entities participating in a plan of reorganization will also be contributing monetarily. (Feb. 25 Tr. 40).

*Objection by LG Doe Claimants*

Six child victims objected to the Parish Stay Agreement by and through counsel. (Bankr. Doc. 304). These six—who filed pseudonymously as LG 35 Doe, LG 42 Doe, LG 43 Doe, LG 44 Doe, LG 79 Doe and LG 86 Doe ("LG Doe Claimants" or "LG Does")[7]—each had pending sexual abuse claims in state court and objected to approval of the Parish Stay Agreement as it applied to them. (Bankr. Doc. 304). The court sustained that part of their objection which asserted injunctive relief must be sought by adversary proceeding. Fed. R. Bankr. P. 7001. The LG Doe Claimants were excluded from the order which approved the Parish Stay Agreement's terms, except for holding counsel to the representation made on the record that Debtor would not be subject to any discovery in the Does' actions. (Bankr. Doc. 345).

**Adversary Proceeding 21-50005: *Diocese v. LG Doe Claimants***

Debtor immediately proceeded to commence an adversary proceeding against the LG Does for declaratory and injunctive relief to enjoin the continued prosecution of their state court lawsuits. Four of the victims' state court lawsuits were commenced pre-petition and name Debtor as well as a parish-affiliate or school as co-defendants. The remaining two lawsuits were commenced post-petition and name only a parish-affiliate of the Debtor.

As represented by counsel, the LG Doe Claimants intend to sever the Debtor from the actions in which Debtor is named and proceed only against the Affiliated Entities and, in one case,

---

[7] The "LG" preface to the LG Doe Claimants' pseudonyms stands for the first two initials of counsel's law firm, Lipsitz Green Scime Cambria LLP. (Feb. 25 Tr. 46). These are the only CVA plaintiffs not covered by the Parish Stay Agreement.

an alleged perpetrator.[8] (Feb. 25 Tr. 52). Three priests, one monsignor and a janitor who was

employed at a school are implicated in the lawsuits. (*Id.*). Each of the LG Doe Claimants, except

LG 35 Doe, would fall under the occurrence-based coverage in Debtor's joint insurance program.

(Murray Decl. ¶¶ 8, 18, 19). As for LG 35 Doe, although there may not be third-party insurance

coverage, the self-insurance program in which the Affiliate participates would entail defense costs

being borne by Debtor. A mediated settlement of the Insurance Litigation is also anticipated to

result in a "lump sum" settlement for claimants denied or otherwise not covered by insurance.

(Feb. 25 Tr. 16-17). Debtor's counsel represents that this has now become customary in Diocesean

reorganizations. (*Id.*).

Within the adversary proceeding, Debtor has filed the current Motion seeking entry of a

temporary restraining order and preliminary injunction pursuant to 11 U.S.C. §§ 105(a) and 362(a).

Debtor seeks an order confirming that the automatic stay enjoins prosecution of the six LG Doe

cases or, in the alternative, enjoining their continued prosecution pursuant to 11 U.S.C. § 105(a).

Debtor seeks this relief through the effective date of a confirmed plan or the dismissal of the

chapter 11 case.

Debtor's Motion was first heard on February 4, 2021. At the hearing, the court set a briefing

schedule and a further hearing on Debtor's request for a preliminary injunction for February 18,

2021. At the February 18 hearing, counsel for the LG Doe Claimants requested further time to

respond to Debtor's filings. The request was granted upon the consent of all parties, with a

temporary restraining order entered in the interim to maintain the status quo until the Motion could

---

[8] In five of the actions, the perpetrator alleged to have committed the sexual abuse is deceased. The action
commenced by LG 44 Doe is the only one where the alleged perpetrator is named as a co-defendant. That
individual is estimated to be in his nineties. (Feb. 25 Tr. 67).

be heard and decided. (Adv. Doc. 27). The hearing proceeded on February 25, 2021 and this decision on the Motion follows.

*Jurisdiction*

The court finds it has core jurisdiction with respect to issues arising under 11 U.S.C. § 362(a) and, at a minimum, related-to jurisdiction as to the injunctive relief sought. 28 U.S.C. §§ 1334, 157; s*ee also In re Quigley, Co. Inc.*, 676 F.3d 45, 57 (2d Cir. 2012) (holding "any claim whose outcome might have any conceivable effect on the bankruptcy estate" is related to the bankruptcy).

**Debtor's Request for Injunctive Relief**

Debtor cites to the provisions of 11 U.S.C. §§ 362(a)(1), (3) and (6) to assert that the LG Doe Claimants are violating the automatic stay by continuing to prosecute their lawsuits. Debtor requests injunctive relief to guard against the same.

*Arguments under the Automatic Stay Provisions of 11 U.S.C. §§ 362(a)(1) and (a)(6)*

In pertinent part, § 362(a)(1) provides that the filing of a petition operates as a stay of the "commencement or continuation…of a judicial…proceeding against the debtor…or to recover a claim against the debtor". In the four actions filed pre-petition that name Debtor as a defendant, the LG Doe Claimants seek to sever Debtor from the state court actions. In the two commenced post-petition, Debtor is not named. Given § 362(a)(1)'s specific statutory language, the court cannot find that the LG Doe Claimants are continuing a judicial proceeding against the Debtor.

The second portion of § 362(a)(1) contains language staying the recovery of claims against debtors, which is echoed in § (a)(6)'s stay of "any act to collect, assess, or recover a claim against the debtor…". It is difficult to establish that the LG Doe Claimants are pursuing the recovery of a claim against the Debtor in state court when the Debtor would either be severed from or was never named in the suit.

Debtor's arguments, however, are not lost on the court. Given Debtor's role in administering the joint insurance program, its payment of applicable deductibles, costs of defense and losses, and its pastoral oversight role of the Affiliated Entities within its territory, any underlying claims will remain on Debtor's radar. Although the LG Doe Claimants' state court litigation does not technically constitute recovery of a claim against the Debtor, the pending lawsuits exert more than a subtle pressure on Debtor to address and settle the claims. Indeed, Debtor argues this pressure is the true intent of the LG Does' actions. (Feb. 25 Tr. 15).

*Arguments under the Automatic Stay Provisions of 11 U.S.C. § 362(a)(3)*

Debtor also argues § 362(a)(3) applies, warranting injunctive relief pursuant to § 105(a) of the Bankruptcy Code. After a debtor files its bankruptcy petition, § 362(a)(3) of the Bankruptcy Code automatically stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over [such] property". In the Second Circuit, a debtor's insurance coverage has been found to constitute property of the estate. *See, e.g.*, *In re Diocese of Buffalo*, *N.Y.*, 618 B.R. 400, 405 (Bankr. W.D.N.Y. 2020), *quoting MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92 (2d Cir. 1988) ("Numerous courts have determined that a debtor's insurance policies are property of the estate, subject to the bankruptcy court's jurisdiction.").

The court finds that the LG Doe Claimants have not violated the automatic stay to date. However, ongoing state court litigation would continue to diminish the estate's shared insurance resources and would inevitably hamper Debtor's reorganization in violation of the principles elucidated in the Bankruptcy Code. Debtor maintains a joint insurance program that is an integral part of its interwoven relationship with the Affiliated Entities. The current $25.7 million fund is available for defense costs, deductibles payable on insurance claims, and, when needed, payment on the underlying claims by the Debtor, its Affiliated Entities or both. (Insurance Motion ¶ 14). Supplemental policies name Debtor and its Affiliated Entities with equal weight, with many subject to occurrence-based caps. (Breen Decl. Adv. Ex. 1-32).

Additionally, Debtor both sought and received the court's approval under 11 U.S.C. § 327(e) to retain a single law firm to defend both Debtor and the Affiliated Entities against CVA claims. (Bankr. Docs. 101, 113, 326, 375). Professionals appointed under 11 U.S.C. § 327(e) are paid directly from a debtor's estate pursuant to § 330 of the Code. On an application heard directly before the hearing on this Motion, the court awarded the law firm roughly $87,000.00 in attorney's fees, which have a first priority in payment from Debtor's estate.[9] (11 U.S.C. § 507; Bankr. Doc. 375). Though the LG Doe Claimants contend supplemental insurance policies would only be triggered upon entry of a judgment in state court, these joint defense expenses are already being disbursed directly from estate funds notwithstanding Debtor's position that the $25.7 million fund is merely a trust and not an estate asset. Debtor maintains the discretion to apply these funds and

---

[9] The Parish Stay Agreement permitted CVA plaintiffs to commence actions against Debtor and the Affiliated Entities and the Debtor to answer. (Bankr. Doc. 345 Ex. A). The law firm billed Debtor for defending Debtor and its Affiliated Entities. (Bankr. Doc. 326 Ex. A). If litigation were ongoing in the LG Doe Claimants' actions, the fees would become more substantial and continue to directly impact estate assets.

has done so. Although Debtor may act as a fiduciary for the Affiliated Entities, it also holds a direct interest in the fund itself.

Debtor's joint insurance policies may appear "murky, jumbled, questionable and uncertain" at this juncture. *In re Diocese of Buffalo*, 618 B.R. at 405. But mediation in the Insurance Litigation is not intended to match every child-victim with every insurance policy, which could take years to unravel through contentious litigation. Instead, Debtor's goal is to obtain a "lump sum" settlement for *all* child-victims, whether covered by a specific policy or not. (Feb. 25 Tr. 16-17). Diminishing the estate's joint insurance policies and the corresponding $25.7 million fund through continued litigation will not only violate § 362(a)(3) but also reduce coverage available to the approximately 96% of child-victims who chose not to object to a stay of state court actions.

The court accordingly finds these considerations under § 362(a)(3) persuasive to warrant § 105(a) relief moving forward. Under § 105(a), bankruptcy courts are authorized to "issue any order, process, or judgment that is necessary or appropriate to carry out the [Bankruptcy Code's] provisions". This includes the issuance of a preliminary injunction. *In re Calpine Corp.*, 365 B.R. 401, 408 (Bankr. S.D.N.Y. 2007).

Bankruptcy courts may issue preliminary injunctions under § 105(a) when necessary or appropriate to carry out § 362(a)(3), a specific provision of the code. *See Queenie, Ltd. v. Nygard Intern.*, 321 F.3d 282, 288 (2d Cir. 2003) (describing how § 105 grants "broader authority" to carry out provisions of the Bankruptcy Code, which includes § 362(a)); *see also Law v. Siegel*, 571 U.S. 415, 421 (2014) ("[The Supreme Court has] long held that 'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code."), *quoting Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988).

Therefore, a preliminary injunction issued under § 105(a) may be used to prevent diminution of insurance property that is subject to the protection of § 362(a)(3).

*Debtor Meets the Standard for a Preliminary Injunction*

To guard against a violation of § 362(a)(3) moving forward, Debtor seeks the issuance of a preliminary injunction under the court's authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). In order to obtain a preliminary injunction, the Debtor must show (i) the likelihood of success on the merits, (ii) the likelihood of irreparable harm to the Debtor absent the injunction issuing, (iii) the balance of equities (or "hardships") tips in favor of the Debtor, and (iv) the injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (Roberts, C.J.); *see also Salinger v. Colting*, 607 F.3d 68, 78-81 (2d Cir. 2010).

The court examines each of these elements below.

*Debtor is Likely to Effectuate a Successful Reorganization*

Likelihood of success on the merits is the first element in the preliminary injunction formula. *Winter*, 55 U.S. at 20. In the bankruptcy context, likelihood of success on the merits may be understood as the likelihood of a successful reorganization. *In re Calpine Corp.*, 365 B.R. 401, 409 (Bankr. S.D.N.Y. 2007); *see also In re Lyondell Chemical Co.*, 402 B.R. 571, 590 (Bankr. S.D.N.Y. 2009) (finding likelihood of success on the merits in the form of an "on track" reorganization) ("Debtors are proceeding on track, and there is no reason to believe or suspect that their reorganization will fail—unless, of course, the acts sought to be enjoined *cause* it to fail.").

To support its argument that a successful reorganization is likely, Debtor points to an accelerated April 15, 2021 bar date, consensual ongoing discovery and proposed mediations in the main bankruptcy case and in the Insurance Litigation. The LG Doe Claimants contend that each of these indicia is speculative and no assurance of success.

Since the filing date, Debtor has moved expeditiously to be "on track" for undertaking the needed steps preliminary to devising a successful plan of reorganization. It has retained specialized professionals to investigate, identify and assess the myriad policies of insurance that provide potential coverage of the claims it is facing. It has coordinated its efforts with counsel representing Affiliated Entities who have an interest in the same policies so that they do not work at cross purposes. And, most notably, Debtor has reached across the table to negotiate with counsel for the Committee, whose members are comprised of disaffected CVA victims. By working together, the ultimate goal of developing the terms of a consensual plan that will provide fair and equitable treatment of this class can be realized, endless litigation can be avoided and assets can be preserved to achieve a just distribution.

Although the likelihood of a successful reorganization is inherently speculative, with the competent professionals involved in this case—many of whom have been involved in other Diocesan reorganizations that have emerged successfully from bankruptcy—a successful reorganization appears likely.

*Likelihood of Irreparable Harm to the Debtor*

Of the required elements for injunctive relief, irreparable harm has been cited as the most important. *See, e.g.*, *Citibank N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (concluding irreparable harm "is 'the sine qua non

of injunctive relief'"), *quoting Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990); *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir. 1978).

Injuries to be avoided by a preliminary injunction must be actual, imminent, and unable to be rectified through monetary damages alone. *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995). The period for evaluating irreparable harm is the window between the motion for an injunction and final disposition of a case on the merits. *Jayaraj v. Scappini*, 66 F.3d 36, 38-39 (2d Cir. 1995).

Nine months into its reorganization efforts, Debtor is at a critical stage in this proceeding. The deadline for filing claims expires next month. Debtor's counsel anticipates that approximately 60 days thereafter, an assessment of the claims will be made. (Feb. 25 Tr. 90). Simultaneously, the mediation with insurers will proceed, and assets from this source and elsewhere will be identified and available to fund the plan. Throughout this period, ongoing negotiations with the Committee will continue.

Any ongoing state court litigation will result in an imminent depletion of the very assets intended to fund the plan and impede a swift and effective global settlement. An insurance coverage defense found in any of the actions that proceed will adversely impact not only the Debtor and the Affiliated Entity named in the action but could also disqualify coverage for other victims whose claims fall under the same insurance policy. Perforce, this would require engagement by the Debtor in the action even though it is not a named party and prove a distraction. Debtor would be ensnarled in monitoring the LG Doe Claimants' litigation when such energies would be better devoted toward crafting a consensual, confirmable plan. The harm to the Debtor in losing its ability to proceed with laser focus on the major bankruptcy issues confronting it would be immeasurable.

Counsel for the LG Doe Claimants implied that the cases could proceed to trial as early as this fall. Should judgments ensue, those judgment-creditors' pressure on assets jointly owned with the Debtor could easily upset the delicate balance of ensuring equal treatment of all victims and undermine the success of the reorganization. In classifying and addressing CVA claims under 11 U.S.C. §§ 1122 and 1123, disruption and division could easily erupt among the class members.

The LG Doe Claimants contend that Debtor has failed to prove the interlocking nature of the insurance policies of the Diocese and Affiliated Entities but the court disagrees. Special insurance counsel for the Debtor explained in detail how occurrence-based policies naming both the Diocese and its Affiliated Entities would be impacted by CVA litigation. (Murray Decl. ¶¶ 5-8; Feb. 25 Tr. 83-84).

The LG Doe Claimants assert that any irreparable harm would impact the Affiliated Entities alone, which the court also rejects. Two of the actions filed by LG 42 Doe and LG 43 Doe name a Catholic School as co-defendant with the Debtor. Should the actions proceed to judgment and executions issue against the bricks and mortar of the school building, the school would likely close down and the mission of promoting religious education shared by the Debtor and its affiliate would also be irreparably harmed.

Therefore, the court finds that Debtor has shown the likelihood that it will suffer irreparable harm if injunctive relief is not granted at this time.

*The Balance of Hardships Tips in Debtor's Favor.*

If an injunction is not entered and certain creditors are allowed to immediately proceed to press their claims in state court, the progress made by the Debtor to date may be undermined. Division may well ensue within the CVA victims' class and consensual negotiations with the

Committee may break down. This could spell the difference between a relatively swift restructuring for a public service-minded debtor and a drawn-out slog in which patience is frayed, goodwill is diminished, administrative expenses are run up and estate assets are ground down. None of these impacts would aid Debtor's formulation of a consensual plan.

In addition to the inability to swiftly and effectively craft a global settlement, the Debtor points to other harms including the imminent depletion of insurance assets, the diversion of both resources and personnel and collateral estoppel issues adverse to the Debtor that could arise from the LG Does' continued prosecution against the Affiliated Entities. (Motion 30-32).

Harms alleged by the LG Doe Claimants are based on their claim that Debtor is "slamming the door shut" on their long-delayed claims. Yet the relief requested is for a preliminary and not a permanent injunction. The LG Doe Claimants' actions in state court will remain pending but stayed during this preliminary period. Counsel asserts, however, that many of the elderly LG Doe Claimants have long awaited justice and suggests that they may not live long enough to see a global bankruptcy resolution. (Bankr. Doc. 304 at 21-22). Such concerns have been exacerbated by the lengthy time period between the alleged abuse and the look-back period established under the CVA. But there is no assurance that state court provides a quicker solution than allowing some time for the bankruptcy process to unfold.

Debtor has stated that it is looking for a "temporary pause" of the litigation while it pursues a uniform and equitable resolution in bankruptcy. Debtor has requested that the temporary pause last 18 months. The court, however, would consider a shorter timeframe to allow the Debtor in the interim to pursue without distraction mediated settlements and the outline of a consensual plan. At such time the court would then reevaluate continuing injunctive relief in consideration of the progress achieved toward confirmation of a plan.

Justice delayed can certainly lead to justice denied, but neither state court nor bankruptcy court promises an overnight solution. However, a uniform and equitable resolution in bankruptcy would avoid bifurcating the claimants and avoid a scenario where Debtor and its Affiliated Entities are caught in an entangling web which holds insurance and other assets captive. The value of these assets might better be applied to ensure that all CVA creditors are treated fairly and equitably, rather than privileging the six LG Doe Claimants over a host of other victims.

Accordingly, the balance of harms tips decidedly toward the Debtor if an injunction does not issue.

*The Public Interest is Best Served by a Preliminary Injunction.*

Finally, Debtor argues that the fourth and final public interest element weighs in favor of issuing a preliminary injunction. Debtor points to the public benefits of a successful Diocesan reorganization and the continued operations of Debtor's humanitarian and charitable efforts. (Motion 32-33).

By contrast, the LG Doe Claimants state the public interest would be frustrated if their six claims were stayed. Their counsel argues that claimants would be forced to accept "meager sums" in bankruptcy while "rich and powerful entities" force global settlements upon claimants, minimize their media exposure, and "slam shut" the door opened by the CVA. All of this, the Does contend, would directly contravene the legislature's intent in passing the CVA. (Bankr. Doc. 304 23).

In considering the public interest element for granting an injunction, the focus is generally on how the parties' specific actions would impact the public at large. *See, e.g.*, *Winter*, 55 U.S. at 13-14. Courts have long recognized that public interest is a "supple principle" with "as many and

as variegated applications...as the situations that have brought it into play." *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941).

It took over a decade for New York State's legislature to pass the CVA. As the potential impact of the legislation was being addressed, all stakeholders were on notice of the prospect of Diocesean bankruptcy filings which had followed the passage of similar legislation in other jurisdictions. The bankruptcy forum ensures that the due process rights of the six LG Doe Claimants will be protected. Their active involvement in that process as a plan is being formulated to ensure that sufficient assets are being allocated in order to make a fair and just distribution on allowed claims will inure to the benefit of all victims. Weighing the equities of the situation, the court finds little harm to their interests if the injunction is granted.

There are estimated to be 217,000 Catholics who are part of the Syracuse Diocese. (Elmer Decl. ¶ 21). A successful reorganization will permit them to freely continue their religious practices within their respective communities without the looming weight of a potential liquidation that could shutter their facilities. Additionally, the effects of the COVID-19 pandemic underscore the need for Debtor's charitable works to continue into the future, with each dollar tied up in a protracted reorganization being one less dollar available for charitable outreach to the community.

The court finds that the fourth and final public interest element supports granting the Debtor preliminary injunctive relief.

## Conclusion

No proceeding in state or federal court will ever fully heal the wounds allegedly inflicted by Debtor and its Affiliated Entities. Nevertheless, this chapter 11 presents a realistic opportunity

for a full, fair, and final resolution of all claimants' injuries through both monetary and non-monetary means.

In arriving at its conclusion to grant preliminary injunctive relief, the court applies the standard recently enunciated by the Supreme Court of the United States:

> Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents. The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward. In awarding a preliminary injunction a court must also "conside[r] ... the overall public interest." In the course of doing so, a court "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case."

*Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080, 2086-87 (2017) (citations omitted).

The court finds sufficient cause to temporarily pause the six LG Doe Claimants' state court actions. Debtor requests an injunction up to the confirmed plan of reorganization's effective date, or in the alternative, 18 months. The court finds a limited injunction period up to and including October 14, 2021 would afford ample time to assess the universe of known claims following the April 15 bar date and to present a confirmable and consensual plan of reorganization without pressure from outside litigation. At the conclusion of this period, the court could then reevaluate continuing injunctive relief in consideration of progress achieved toward confirmation of a plan.

Furthermore, with ongoing Rule 2004 discovery now underway between the Debtor and the Committee under the Parish Stay Agreement, the LG Doe Claimants will still have available avenues for accessing information under the same terms. The court will entertain any conferences or motions required to resolve any disputes as to the parameters of future discovery.

Accordingly, the court hereby stays each of the LG Doe Claimants' state court actions through and including October 14, 2021. ("Stay Period"). The LG Does, their attorneys and agents

are enjoined and prohibited from taking any action, directly or indirectly, in further prosecution of their CVA claims throughout the course of the Stay Period. Furthermore, the Stay Period shall not be included in computing the running of any time periods with respect to any deadlines involving the LG Doe Claimants' actions.

The court retains jurisdiction to hear and determine all matters arising from or related to the implementation and enforcement of this order.

So ordered.

DATED:      March 5, 2021
            Syracuse, New York

Margaret Cangilos-Ruiz
United States Bankruptcy Judge